UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>v.<br><br>JOSE MORALES (9), SERGIO PARTIDA (7), ANA KAREN ROBLES-ORTIZ (8)<br><br>                              Defendants. | Case No.:  19-cr-03255-BTM<br><br>**ORDER DENYING DEFENDANTS JOSE MORALES AND SERGIO PARTIDA'S MOTIONS TO DISMISS THE INDICTMENT AND ANA KAREN ROBLES-ORTIZ'S MOTION TO DISMISS COUNT 7 OF THE INDICTMENT**<br><br>**[ECF NOS.  384, 387, 390]** |

   Before the Court are Defendant Jose Morales' Motion to Dismiss the Indictment, (ECF No. 390 ("Morales Mot.")), Defendant Sergio Partida's Motion to Dismiss the Indictment, (ECF No. 387 ("Partida Mot.")), and the remainder of Defendant Ana Karen Robles-Ortiz's Motion to Dismiss Count 7 of the Indictment[1], (ECF No. 384 ("Robles-Ortiz Mot.")).  Because the arguments in all three motions rely on the Religious Freedom Restoration Act ("RFRA") and the First Amendment, the Court addresses the motions together.  Defendants

---

[1] The Court previously denied in part Defendant Ana Karen Robles-Ortiz's Motion to Dismiss Count 7 of the Indictment as to her constitutional vagueness challenge.  (ECF No. 477.)

Arnoldo Bugarin, Jose Anthony Diaz, Mercedes Gonzalez-Diaz, Sergio Partida, Susan Gonzalez, Victor Gonzalez, Azucena Torres, Jose Demara Flores, and Ana Karen Robles-Ortiz have joined the Morales Motion. (ECF No. 460.) Defendants Arnoldo Bugarin, Jose Anthony Diaz, Mercedes Gonzalez-Diaz, Sergio Partida, Susan Gonzalez, Jose Morales, Victor Gonzalez, Azucena Torres, and Jose Demara Flores have joined the Robles-Ortiz Motion. (*Id.*) The Court heard oral argument on October 18, 2021. For the reasons discussed below, the Defendants' motions are **DENIED**.

## I. BACKGROUND

On August 23, 2019, Jose Morales, Sergio Partida, Ana Karen Robles-Ortiz and their co-defendants were charged with committing forced labor (18 U.S.C. § 1589), document servitude (18 U.S.C. § 1592), benefits fraud (7 U.S.C. § 2024(b)), and conspiracy to commit one or more of those offenses (18 U.S.C. § 371), in relation to an alleged scheme involving participants of Imperial Valley Ministries ("IVM"). (ECF No. 1.)

The Indictment included allegations that Defendants: **(a)** "induced IVM participants' consent to surrender SNAP benefits for the benefit of IVM through the wrongful use of actual or threatened fear of economic loss"; **(b)** "refused to return EBT cards to IVM participants who requested to leave IVM unless specifically requested by the participant"; **(c)** "told IVM participants who requested to leave IVM that they must wait for a home director to return in order to receive their personal belongings in order to compel them to remain at IVM"; **(d)** "acquired, possessed, used, and transferred EBT cards belonging to IVM participants for the benefit of ineligible persons"; **(e)** "dispatched IVM participants to panhandle for the benefit of IVM" and "collected panhandling proceeds from IVM participants"; **(f)** "drove [an IVM participant] to an ATM to withdraw Supplemental Social Income benefits from his account and confiscated the funds"; **(g)** "compelled IVM participants to remain at [an IVM location] by saying

their children would be taken away if they left IVM"; **(h)** "instruct[ed] IVM participants not to seek or accept employment outside of IVM"; **(i)** falsely represented to IVM participants that "only a maximum of 40% of the SNAP benefits would be used monthly"; **(j)** "punished IVM participants for breaking IVM rules," including denying them food; **(k)** falsely represented to IVM participants that they would be returned home if they did not like IVM; **(l)** denied IVM participants' requests to leave an IVM location; **(m)** "physically restrained [an IVM participant] from leaving an IVM vehicle"; **(n)** refused IVM participants' requests to seek medical attention; **(o)** "refused to return a government identification card belonging to [an IVM participant] when she left [an IVM location], which caused [the participant] to return"; **(p)** refused IVM participants' requests to contact their family members; **(q)** "refused an IVM participant's request for access to SNAP benefits"; **(r)** "locked all doors at [an IVM location] to compel [an IVM participant] to remain"; **(s)** confiscated the personal belongings of IVM participants, such as driver's licenses, state identification cards, bank cards, naturalization certificates, medicine, and Social Security cards; **(t)** refused IVM participants' requests for transportation back home; and **(u)** "grabbed and held [an IVM participant] by the wrists to prevent her from leaving [an IVM location]." (*Id.* at 12-26.)

## II. DISCUSSION

Defendants argue that "[t]he charges in the Indictment impermissibly burden [their] religion under RFRA and violate [their] religious freedom under the First Amendment to the United States Constitution." (Morales Mot. at 13.)

**A. RFRA**

> RFRA suspends generally applicable federal laws that substantially burden a person's exercise of religion unless the laws are the least restrictive means of furthering a compelling governmental interest. To establish a prima facie claim under RFRA, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find the existence of two elements.  First, the activities the plaintiff claims are burdened by the government action must be an exercise of religion.

> Second, the government action must substantially burden the plaintiff's exercise of religion. Where a plaintiff has established these elements, the burden of persuasion shifts to the government to prove that the challenged government action is in furtherance of a compelling governmental interest and is implemented by the least restrictive means.

*Oklevueha Native Am. Church Of Hawaii, Inc. v. Lynch*, 828 F.3d 1012, 1015 (9th Cir. 2016) (internal citations and quotations omitted) (citing 42 U.S.C. § 2000bb-1).

      i.    <u>Sincere Religious Beliefs</u>

Because the Court's rulings on Defendants' motions do not depend on this prong, for purposes of efficiency, the Court will assume the sincerity and religious nature of each Defendants' purported exercise of their religious beliefs.

      ii.    <u>Substantial Burden</u>

"Under RFRA, a substantial burden is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (internal citations and quotations omitted).

Defendants argue that "[t]he government's allegations against [Defendants] relate entirely to [their] participation in [IVM's] program[s]—evangelizing, fundraising and following the House Rules as outlined in the Agreement [they] signed on the date of [admission into IVM's programs]. All of these Rules are rooted in theology and are part of IVM's religious doctrine." (Morales Mot. at 21.) Defendants also argue that the Government's prosecution of IVM members has either "forced [them] to stop working with IVM" or "resulted in the shutdown of the IVM recovery homes in the Imperial Valley as well as the IVM church." (Partida Mot. at 5; Morales Mot. at 21.) Defendant Ana Karen Robles-Ortiz specifically objects to the Government's prosecution of her under 7 U.S.C. § 2024 (benefits

fraud), arguing that it criminalizes "donation to a church." (Robles-Ortiz Mot. at 6.)

The Government has charged Defendants with committing forced labor (18 U.S.C. § 1589), document servitude (18 U.S.C. § 1592), benefits fraud (7 U.S.C. § 2024(b)), and conspiracy to commit one or more of those offenses (18 U.S.C. § 371). An individual has committed forced labor if the individual:

> knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. . . .[or] knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described [above], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

18 U.S.C. § 1589. An individual has committed document servitude if the individual:

> knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person—(1) in the course of a violation of section . . . 1589 [forced labor] . . . [or] (2) with intent to violate section . . . 1589 [forced labor].

18 U.S.C. § 1592. An individual has committed benefits fraud if the individual "knowingly uses, transfers, acquires, alters, or possesses benefits in any manner contrary to this chapter or the regulations issued pursuant to this chapter." 7 U.S.C. § 2024(b).

//

The Court finds too attenuated a link between the Government's prosecution of Defendants for forced labor, document servitude, and benefits fraud and Defendants' purported religious activities of evangelizing, fundraising, donating to the church, and general operation of IVM programs for there to be a substantial burden, as there remain viable alternative avenues for Defendants to conduct their specified religious activities. *See Wisconsin v. Yoder*, 406 U.S. 205, 211-218 (1972) (a compulsory school-attendance law imposed a substantial burden on members of the Amish religion who sincerely believed that "[f]ormal high school education beyond the eighth grade [was] contrary to Amish beliefs," because the law "affirmatively compel[led] them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs" as "they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region"); *Oklevueha*, 828 F.3d at 1016 ("nothing in the record demonstrates that a prohibition on cannabis forces [defendants] to choose between obedience to their religion and criminal sanction, such that they are being coerced to act contrary to their religious beliefs," where cannabis was consumed "in addition to and [as a] substitute for their primary entheogenic sacrament, Peyote," and where there was "no claim that peyote [was] unavailable or that cannabis serve[d] a unique religious function"); *Kiczenski v. Gonzales*, 237 F. App'x 149, 151 (9th Cir. 2007) (defendant's "[RFRA] challenge failed because he was unable to demonstrate the Controlled Substances Act's limitation on hemp cultivation would be a substantial burden on his broad ability to practice plant cultivation as a religious exercise"). For example, 18 U.S.C. § 1589 (forced labor) and 18 U.S.C. § 1592 (document servitude) do not prevent Defendants entirely from fundraising for IVM. Rather, the statutes impose criminal penalties in circumstances where Defendants coerce others to fundraise for IVM using improper force or threats, including the confiscation of government identification documents. According to

the Indictment, Defendants refused to return personal belongings and government identification cards to IVM participants, compelled participants to stay by threatening to take their children away, physically restrained participants, locked doors at IVM locations, refused participants' requests for medical treatment, refused participants' requests to contact their family members, and refused participants' requests for transportation back home.  (*See* ECF No. 1 at 12-26.)  Prosecuting Defendants for alleged uses of improper force and threats does not necessarily force Defendants to entirely abandon their religious tenet of fundraising.  The forced labor and document servitude statutes do not prevent Defendants themselves from fundraising for IVM or prevent Defendants from convincing participants to voluntarily fundraise for IVM.  The statutes also do not prevent Defendants from making it a program requirement for participants to fundraise for IVM and enforcing that requirement in ways that do not involve improper force or threats, for example, by ejecting uncooperative participants from the programs.  Similarly, enforcement of the forced labor and document servitude statutes do not force Defendants to entirely abandon their religious tenets of evangelizing or following IVM program rules.  Rather, the statutes sanction certain methods of evangelizing or enforcing IVM program rules that involve the use of improper force or threats. *See Guam v. Guerrero*, 290 F.3d 1210, 1223 (9th Cir. 2002) (while marijuana use is sacramental in Rastafarianism, "we are satisfied that Rastafarianism does not require importation of a controlled substance, which increases the availability of controlled substances and makes it harder for Guam to control. Therefore, Guam's controlled substance statute does not substantially burden [defendant's] right freely to exercise his religion, and RFRA provides [defendant] no defense to the charge that he unlawfully imported a controlled substance into Guam"); *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996) ("As to the counts relating to conspiracy to distribute [marijuana], possession with intent to

distribute, and money laundering, the religious freedom of the defendants was not invaded. Nothing before us suggests that Rastafarianism would require this conduct."). The statutes do not prevent Defendants from, for example, fully informing participants of IVM program rules and requiring them to follow those rules as a condition of continued participation in the programs.

Neither does enforcement of 7 U.S.C. § 2024(b) (benefits fraud) prevent Defendants entirely from tithing or donating to the church. According to the Indictment, Defendants "induced IVM participants' consent to surrender SNAP benefits for the benefit of IVM," and transferred, possessed, and used SNAP benefits "belonging to IVM participants for the benefit of ineligible persons." (ECF No. 1 at 12-13, 16-20, 24.) The benefits fraud statute does not prevent Defendants from making non-SNAP benefits donations to the church. Further, the statute and related regulations provide an avenue for IVM participants to properly transfer their SNAP benefits for use by IVM. "A drug addict or alcoholic treatment center, group living arrangement, or shelter for battered women and children may purchase food in authorized retail food stores as the authorized representative of its participating households." 7 C.F.R. § 278.2(g)(1). Under California's Food Stamp Regulations Section 63-402.621:

> The residents of drug or alcoholic treatment centers shall apply and be certified for Food Stamp Program participants through the use of an authorized representative who shall be an employee of and designated by the institution that is administering the treatment and rehabilitation program. The institution shall receive and spend the coupon allotment for food prepared by and/or served to the residents of the center who are participating in the Food Stamp Program. Each resident participating in the treatment program, together with his/her children, shall be certified as an individual household without regard to a spouse and/or family members (other than the children of the narcotic addict or alcoholic) who may or may not reside at the treatment center.

(Robles-Ortiz Mot., Exh. 4., California Food Stamp Regulations Eligibility

Standards.)  The benefits fraud statute does not prevent Defendants from complying with the applicable regulations to permit IVM to pool together and use participants' SNAP benefits.

To the extent Defendants argue that they have established a substantial burden because, as a consequence of the Government's prosecution, they have been cut off from IVM or IVM programs have shut down, the Court is not persuaded.  As one court has explained, "if the mere fact of prosecution were enough to trigger a substantial burden, every criminal Defendant raising a RFRA claim would be able to succeed on this element, rendering the substantial burden portion of the RFRA test superfluous in criminal cases."  *United States v. Jeffs*, 2016 WL 6745951, at *7 (D. Utah Nov. 15, 2016).  To the extent that evangelizing, fundraising, donating, and following IVM program rules are required for the continued operations of IVM programs, as explained above, the forced labor, document servitude, and benefits fraud statutes do not prevent Defendants entirely from engaging in those activities.  Defendants are not forced to choose between facing criminal penalties or abandoning their religious activities or IVM altogether, rather, the statutes simply penalize certain ways in which those activities might be conducted or how IVM operates.  Defendants have not met their initial burden to establish that their specified exercise of their assumed sincere religious beliefs have been substantially burdened by the Government's enforcement of the forced labor, document servitude, and benefits fraud statutes.

     iii. <u>Compelling Governmental Interest</u>

Even assuming that Defendants have met their initial burden under the RFRA, the Court holds that the Government has a compelling interest in prosecuting Defendants pursuant to 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1592 (document servitude), and 7 U.S.C. § 2024(b) (benefits fraud) for their alleged conduct against IVM participants.

> [The] RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened. Hence, [courts] must look beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize the asserted harm of granting specific exemptions to particular religious claimants. The compelling-interest determination is not to be made in the abstract, but in the circumstances of [the] case.

*United States v. Christie*, 825 F.3d 1048, 1056–57 (9th Cir. 2016) (internal citations and quotations omitted).

18 U.S.C. § 1589 (forced labor) "was passed to implement the Thirteenth Amendment against slavery or involuntary servitude. Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion, as well as through physical or legal coercion." *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), as amended (Mar. 3, 2017) (internal citations and quotations omitted). "Congress enacted § 1589 . . . to expand the forms of coercion that could result in forced labor." *United States v. Callahan*, 801 F.3d 606, 618 (6th Cir. 2015). House Conference Report No. 106-939 explains that 18 U.S.C. § 1592 (document servitude) "address[es] . . . cases where one of the other crimes [was] not completed, but where there is evidence that a trafficker intended to commit such a crime and withheld or destroyed immigration or identification documents for the purpose of preventing the trafficking victim from escaping." H.R. Conf. Rep. 106-939, at 102 (October 5, 2000).

As applied to Defendants, the Government alleges in the Indictment that "IVM members [were instructed] to keep IVM participants from leaving IVM because IVM needed money," and alleges specific incidents where Defendants forced IVM participants to "panhandle" while in IVM programs, and used coercive methods to keep IVM participants from leaving the programs, including confiscating and refusing to return personal belongings and government

identification documents to IVM participants, telling IVM participants that their children would be taken away if they left IVM, denying IVM participants food for breaking IVM rules, making false representations to IVM participants that they would be returned home if they did not like IVM, denying IVM participants' requests to leave an IVM location or for transportation back home, physically restraining an IVM participant from leaving an IVM vehicle, refusing IVM participants' requests to seek medical attention, refusing IVM participants' requests to contact their family members, locking all doors at an IVM location, and grabbing and holding one IVM participant by the wrists to prevent her from leaving an IVM location. (ECF No. 1 at 11-26.) The Government has established a compelling interest for specifically prosecuting Defendants pursuant to the forced labor and document servitude statutes to address alleged harms already committed against IVM participants, and to prevent future harms. *See Christie*, 825 F.3d at 1057 (the government had a compelling interest in enforcing the Controlled Substances Act against the Hawaii Cannabis Ministry because "there [was] specific evidence that the Ministry's distribution methods created a realistic possibility that cannabis intended for members of the Ministry would be distributed instead to outsiders who were merely feigning membership in the Ministry and adherence to its religious tenets" and the "Ministry's well-publicized willingness to extend membership in the Ministry (with all that that entails) to minors"); *United States v. Lafley*, 656 F.3d 936, 940 (9th Cir. 2011) ("The government has a compelling interest in denying a convicted drug felon a religious exemption that would permit him to use drugs while serving his term of supervised release.").

As to the enforcement of 7 U.S.C. § 2024(b) (benefits fraud) against Defendants, the Government argues that it "has a compelling interest in guarding its nutrition program against fraud" and "stopping others from taking those benefits from needy households." (ECF No. 435 ("Gov. Opp.") at 20.) As applied

to Defendants, the Indictment specifically alleges that Defendants "induced IVM participants' consent to surrender SNAP benefits for the benefit of IVM through the wrongful use of actual or threatened fear of economic loss," "refused to return [SNAP] EBT cards to IVM participants who requested to leave IVM unless specifically requested by the participant," "acquired, possessed, used, and transferred [SNAP] EBT cards and [SNAP benefits] belonging to IVM participants for the benefit of ineligible persons," "instructed IVM participants not to seek or accept employment outside of IVM," "acquired [SNAP] EBT cards belonging to IVM participants upon the false representation that only a maximum of 40% of the SNAP benefits would be used monthly," "punished an IVM participant for breaking an IVM rule by denying food for one day," and "refused an IVM participant's request for access to SNAP benefits." (ECF No. 1 at 12-20.) The Indictment does not simply allege limited and isolated violations of the benefits fraud statute, but rather systemic violations of the statute by Defendants, over a period of approximately 5 years, resulting in IVM participants being deprived of food or access to their SNAP benefits, and non-eligible individuals receiving SNAP benefits. The Government has established a compelling interest for specifically prosecuting Defendants pursuant to the benefits fraud statute. *See Jeffs*, 2016 WL 6745951, at *12-13 (in the context of a RFRA challenge to a criminal prosecution under the benefits fraud statute, the court held that "the government ha[d] shown that it ha[d] a compelling interest in limiting the use of SNAP benefits to the purchase of food to be used by the household" because "if SNAP recipients do not keep and consume the food purchased through the use of their benefits, the goals of the program would clearly be frustrated" and there were allegations of "systematic donations" of SNAP benefits to a church, as well as allegations that "shortages [of food at the church] were caused, at least in part, because non-eligible individuals were making use of food obtained through SNAP benefits").

### vi. Least Restrictive Means

Having held that the Government has compelling interests in prosecuting Defendants pursuant to the forced labor, document servitude, and benefits fraud statutes, the Court also holds that doing so is the least restrictive means necessary to achieve those interests.

> [T]he "least restrictive means" test calls for a comparative analysis. In one corner we have the government's preferred means: a mandate that [defendants] comply with the [statutes], enforceable with criminal penalties. [The court's] job is to lay such preferred means side by side with other potential options. Could the government achieve its compelling interest to the same degree while exempting [defendants] from complying in full with the [statutes]? . . . At a minimum, the government must address those alternatives of which it has become aware during the course of this litigation. The government must show that each proposed alternative either is not less restrictive within the meaning of RFRA, or is not plausibly capable of allowing the government to achieve all of its compelling interests.

*Christie*, 825 F.3d at 1061 (internal citations and quotations omitted).

With respect to the Government's enforcement of the forced labor and document servitude statutes, Defendants argue that there could be religious exemptions to the statutes. Defendants argue that "the forced labor statute [already] has many exemptions," citing examples that courts have determined do not qualify as involuntary servitude, including a state requiring an attorney to work pro bono and a scholarship program requiring a doctor to perform pro bono services as a condition of accepting the scholarship. (ECF No. 453 ("Morales Reply") at 15.) However, the Court is not persuaded that Defendants' examples are apt, as they do not necessarily involve comparable forms and degrees of coercion to what the Government alleges in the Indictment. *See Christie*, 825 F.3d at 1061 ("[defendants] cannot simply point to other groups who have won accommodations for the sacramental use of peyote and hoasca and say 'we'll have what they're having,' because the government has shown material

differences between those particular groups and their sacramental practices, on the one hand, and the [defendants] and their religious exercise, on the other.)  To the extent that Defendants argue that their alleged conduct merely involves forms and degrees of force and coercion comparable to a program's pro bono requirement, that argument more appropriately addresses the merits of whether their conduct rises to the level of forced labor or document servitude violations, rather than whether Defendants should be exempt from enforcement of the statutes.  Defendants also reference the "ministerial exception," where "the First Amendment flatly bars certain employment discrimination claims brought by ministers against the religious groups that employ them or formerly employ them."  (Morales Reply at 15.)  Defendants' proposed alternative to exempt religious organizations from enforcement of the forced labor and document servitude statutes would permit members of religious organizations to coerce individuals into conditions of involuntary servitude through otherwise improper force and threats, which would plainly frustrate the Government's compelling interest in preventing the harms that occur when individuals are held in certain conditions of servitude using certain forms and degrees of coercion.  The Court holds that Defendants' proposed alternative for a religious organization exemption to the enforcement of the forced labor and document servitude statutes is not plausibly capable of allowing the government to achieve its compelling interest in preventing involuntary solitude.  *See Christie*, 825 F.3d at 1062-63 (where defendants proposed a "more circumscribed manner" of using and distributing cannabis as an alternative to "the CSA's total prohibition on using and distributing cannabis," the Court explained that "it [was] simply not plausible to suppose that the government could achieve its compelling interest in preventing diversion [of cannabis] if it were to accommodate [defendants] in the way they have proposed"); *Lafley*, 656 F.3d at 941–42 (analyzing a supervised release condition that stated that the defendant "shall not purchase, possess,

use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician," the Court found that "[n]o less restrictive condition could feasibly and adequately prohibit [defendant] from using marijuana" and "conditions prohibiting his use of drugs other than marijuana" and "restricting testing to other controlled substances would not accomplish the end of preventing [defendant] from using illegal drugs during his supervised release.").

With respect to the Government's enforcement of the benefits fraud statute, Defendants argue that "[i]nstead of prosecuting under these statutes, the government could employ other administrative remedies" such as "defer[ring] matters of improper combining of benefits to the County Welfare Department" or "issu[ing] warnings and host[ing] educational sessions for leaders [of] group homes." (Morales Mot. at 17-18.)  In the Indictment, the Government alleges repeated conduct by Defendants, over a period of approximately 5 years, that violate the benefits fraud statute.  The RFRA does not require that the Government first pursue other less punitive options before initiating a criminal prosecution.  *See Christie*, 825 F.3d at 1062 (9th Cir. 2016) (rejecting defendant's proposed alternative "for the government to bring [the] prosecutions under a less punitive provision of the [Controlled Substances Act]," because "given the broad array of charges prosecutors can choose to bring or not to bring in any given case, recognizing [defendants'] theory would plunge courts far too deep into the business of reviewing the most basic exercises of prosecutorial discretion" and also explaining that "[t]he CSA gave [defendants] all the notice to which they were entitled; no authority we have encountered suggests that RFRA obligates the government to tip off parties who are about to be indicted and might raise a RFRA defense. Such outreach might be good practice—at least in those cases where the government is aware of the possibly religious nature of the offensive conduct—but we cannot say that RFRA compels it.").  Further, limiting

the Government's prosecutorial discretion in addressing conduct that it alleges otherwise violates the benefits fraud statute would plainly frustrate the Government's compelling interests in preventing fraud against the program and ensuring that SNAP benefits are used by and for the benefit of qualifying recipients, and do not go to non-eligible individuals.  *See Jeffs*, 2016 WL 6745951, at *14 (holding that the benefits fraud statute was the least restrictive means of furthering the government's interests because the defendants' proposed alternative scheme "would necessarily interfere with SNAP benefits being used to purchase foods to be used by the household" and "would fail to promote the government's interests because it [would] allow non-eligible individuals to receive food purchased through the use of SNAP benefits.").  The Government has established that prosecuting Defendants pursuant to the forced labor, document servitude, and benefits fraud statutes is the least restrictive means necessary to achieve those interests.

Because Defendants have not met their initial burden to establish that the Government's enforcement of the forced labor, document servitude, and benefits fraud statutes substantially burdens the specified exercise of their assumed sincere religious beliefs, and because the Government has established that it has compelling interests in enforcing the statutes against Defendants, and that doing so is the least restrictive means necessary to achieve those interests, Defendants' motions to dismiss based on their RFRA arguments are **DENIED**.

//
//
//
//
//
//
//

## B. First Amendment

> The First Amendment's Free Exercise Clause, which applies to the states via the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise [of religion].' The right to exercise one's religion freely, however, does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes). . . . [A] neutral law of general application need not be supported by a compelling government interest even when the law has the incidental effect of burdening a particular religious practice. Such laws need only survive rational basis review. For laws that are not neutral or not generally applicable, strict scrutiny applies.

*Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015) (internal citations and quotations omitted). Defendants concede that the forced labor, document servitude, and benefits fraud statutes are facially neutral because "[l]ooking to the text of the statutes, no overt reference 'to a religious practice exists'" and "[c]onstrained to the letters on the printed page, the statutes do not, in fact, appear to target a particular religion." (Morales Mot. at 25.) However, Defendants argue that as applied to them, the statutes violate the Free Exercise Clause of the First Amendment because "[t]he present action applies [the statutes] specifically and discriminatorily against IVM members while simultaneously allowing other groups to engage in similar activities without federal prosecution." (Morales Mot. at 28.) Defendants argue that "the government has not prosecuted the rehabilitation centers, both in this district and nationally, that require participants to engage in unpaid manual labor (Recovery Center, Trinity Baptist, Cenikor, CAAIR), share benefits (Salvation Army, Cenikor), and keep identification documents for periods of at least six months (Salvation Army)" and that they have "found no case accusing homeless shelters, sober living houses, or non-profit religious organizations of Benefits Fraud." (Morales Reply at 12-13, 16.)

The Court is not persuaded that Defendants have established that strict scrutiny is appropriate in this case, as Defendants' references to other organizations that have not been prosecuted under the forced labor, document servitude, and benefits fraud statutes do not establish that only Defendants were prosecuted because of their religion, rather than, for example, because of material differences in the form, degree, or scope of any alleged uses of force and coercion to obtain labor or possession and use of SNAP benefits.  (*See* Morales Reply at 7-11, Exhs. M, N.)  However, even assuming that strict scrutiny applies, for Defendants' RFRA claims, the Court has already held that the Government has compelling interests in prosecuting Defendants pursuant to the forced labor, document servitude, and benefits fraud statutes, and that doing so is the least restrictive means necessary to achieve those interests.  For the same reasons, for Defendants' First Amendment claims, the Court also holds that the Government has compelling interests in prosecuting Defendants pursuant to the forced labor, document servitude, and benefits fraud statutes, and that doing so is narrowly tailored to serve those interests.  *See Christie*, 825 F.3d at 1062 (explaining that the RFRA employs the "strict scrutiny" standard); *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) ("RFRA essentially requires the government to justify any regulation imposing a substantial burden on the free exercise of religion by showing that the regulation satisfies strict scrutiny.") (internal citation and quotations omitted); *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1142 (9th Cir. 2021) ("Narrow tailoring requires that the State employ the least restrictive means to advance its objective") (internal citations and quotations omitted).  Defendants' motions as to their First Amendment arguments are **DENIED.**

//
//
//

19-cr-03255-BTM

## III. CONCLUSION

Based upon the foregoing, Defendant Jose Morales' Motion to Dismiss the Indictment (ECF No. 390), Defendant Sergio Partida's Motion to Dismiss the Indictment (ECF No. 387), and the remainder of Defendant Ana Karen Robles-Ortiz's Motion to Dismiss Count 7 of the Indictment (ECF No. 384) are **DENIED**.

**IT IS SO ORDERED**.

Dated:  December 13, 2021

_____
Honorable Barry Ted Moskowitz
United States District Judge